KC Maxwell (Cal. State Bar No. 214701)
MAXWELL LAW PC
21 Forrest St.
Mill Valley, CA 94941
Telephone: (415) 322-8817
E-mail: kcm@kcmaxlaw.com

Attorney for Defendant DAN HYER

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>DAN HYER,<br><br>    Defendant. | Case No. CR-18-422-DJH<br><br>**DEFENDANT DAN HYER'S SENTENCING MEMORANDUM; MOTION FOR DOWNWARD DEPARTURE**<br><br>Date: September 9, 2025<br><br>Before the Honorable<br>United States District Judge Humetewa |

## I. PRELIMINARY STATEMENT

Defendant Dan Hyer ("Defendant" or "Hyer"), by and through his counsel, respectfully submits the following Sentencing Memorandum. Mr. Hyer comes before this Court having pleaded guilty on August 17, 2018, to Count 1 of the Superseding Indictment charging him with conspiracy. *See* Dkt. No. 271 (Plea).

A violation of 18 U.S.C. § 371 is punishable by a maximum term of imprisonment of 5 years and a term of supervised release of 3 years. A maximum term of probation is five years. *See id*. The government has filed a motion pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 recommending a sentence of probation. (the "recommended sentence").

Accordingly, pursuant to *United States v. Booker*, 543 U.S. 220 (2005), U.S.S.G. § 5k1.1, the 18 U.S.C. § 3553(a) & (e) factors, and the parties' plea and cooperation agreements, Mr. Hyer respectfully requests that the Court sentence him to the recommended non-custodial sentence. In addition to the bases supporting this sentenced presented by the United States, Mr. Hyer, respectfully contends that his (i) cooperation with the government; (ii) unblemished compliance with pretrial conditions; (iii) stellar work for over seven years since his arrest, and (iv) need to care for his chronically ill wife, further supports imposition of the recommended sentence, which is "sufficient, but not greater than necessary" to account for Mr. Hyer's circumstances and his conduct and role in this case. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

## III. PLEA AGREEMENT AND RECOMMENDATION

The terms of Mr. Hyer's Plea Agreement with the United States provide for no specific sentence or guidelines range (Plea Agreement, Dkt. No. 271) but acknowledge that his plea to Count One subjects him to a statutory maximum sentence of five (5) years before any government motion pursuant to U.S.S.G. § 5K1.1 and 3553(e). Mr. Hyer agrees with the United States' Motion for Downward Departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e).

## IV. COOPERATION WITH THE GOVERNMENT

After turning himself into the Federal Bureau of Investigation (FBI) on April 6, 2018, and being released on April 9, 2018, under U.S. Pretrial supervision, (Dkt. No. 2328, Draft PSR at ¶

4), Mr. Hyer pleaded guilty and agreed to cooperate with the government.  (Dkt. No. 271, Cooperation Addendum (Filed Under Seal) at ¶ 1.)

While Mr. Ferrer served as a linchpin cooperator with extensive knowledge of global assets and operations, Mr. Hyer provided corroborative, targeted cooperation in line with his more limited role. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Pursuant to Section 5K1.1, substantial assistance may justify a departure from the guidelines.  § 5K1.1 & Note 1.  That sentencing reduction is considered independent of Defendant's acceptance of responsibility.  *Id.*, Note 2.  The extent of the departure is committed to the discretion of this Court.  *United States v. Keene*, 933 F.2d 711, 713-15 (9th Cir. 1991).  But substantial weight should be given to the government's evaluation of the extent of defendant's assistance. . . ."  § 5K1.1 & Note 3.  Mr. Hyer submits that independent of the Section 3553(a) factors, his timely and full cooperation with the Government supports fully a downward departure and the recommended sentence.  § 3553(e).

V.     **LEGAL STANDARDS GOVERNING SENTENCING**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011). "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Id.*

This Court has broad discretion to sentence Mr. Hyer outside the advisory guidelines.  After the great sea change occasioned by *United States v. Booker*, 543 U.S. 220 (2005), this Court is empowered -- and obligated -- to "make an individualized assessment" of a just sentence pursuant to the factors presented in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 50 (2007).

The Court is thus charged to "impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing, including to reflect the seriousness of the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant." *Kimbrough*, 552 U.S. at 101, 128 S. Ct. at 570 (quotation marks omitted; emphasis added); *see also* 18 U.S.C. § 3553(a). District courts may even vary from Guidelines ranges based solely on policy considerations, including cases where the Guidelines do not adequately reflect statutory factors. *Id.*; *cf. Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2465 (2007).

Although the factors to be considered under U.S.S.G. § 5K1.1 differ from those under 18 U.S.C. § 3553, an overview of Mr. Hyer's character and remarkable rehabilitation over the last seven years provides a powerful context for the Court to exercise its discretion in fashioning a just sentence.

## VI. SECTION 3553(a) FACTORS

### A. Section 3553(a)(1) -- The History and Characteristics of Hyer

Dan Hyer is a 57-year-old husband, caregiver, and first-time felony offender with a documented history of early trauma, recovery, and cooperation. His life, though marked by past mistakes, reflects resilience, remorse, and a deep commitment to accountability. Mr. Hyer's background, longstanding sobriety, and genuine rehabilitation make him a uniquely appropriate candidate for a sentence below the five-year statutory maximum.

Born in Rockford, Illinois in 1968 and raised in Eldridge, Iowa, Mr. Hyer's early years were shaped by the volatility of a home stressed by his father's frequent travel and the unspoken emotional toll it placed on the family. Although his childhood lacked physical abuse, it was emotionally unstable, and he internalized the unspoken rule that love was earned through performance. As a boy, he worked hard to please: first on the basketball court, later with a guitar in his hands.

A gifted and obsessive musician, Mr. Hyer earned a degree in liberal arts and music from what is now known as Truman University, where his compositions were published in national magazines and his bands began to tour. But the rock-and-roll lifestyle came with consequences.

By the mid-1990s, Mr. Hyer had developed serious substance use problems that nearly derailed his life. It was during this time -- at a bar in Dallas, bloodied and drunk -- that he met ▇▇▇▇ the woman who would become his wife and spiritual anchor. With her love and encouragement, he found sobriety, Christ, and a new sense of purpose.

Mr. Hyer has now been clean and sober for over 25 years. He credits his faith and his wife for that unwavering commitment, as well as the life he built after leaving music behind. He channeled his obsessive energy into sales, where he worked hard, often too hard, to earn the respect he had always craved. In 1998, he responded to a classified ad and began working for Carl Ferrer, who would later become CEO of Backpage.

He joined Backpage's sales and marketing team part-time in 2006, reporting directly to Ferrer, and worked primarily in a marketing silo. He did not have decision-making control or equity in the company. Unlike his codefendants who made tens of millions and directed company policy, Mr. Hyer was a salaried employee working in the shadow of powerful men. Mr. Hyer followed Carl Ferrer -- his boss whom he considered a father figure and mentor -- across several companies over two decades. His deference to Ferrer, and his belief that Backpage's activities were being vetted by counsel and company leadership, colored his understanding of the legal risks. One of his greatest errors was failing to challenge authority.

Despite his subordinate role, Mr. Hyer recognizes that he crossed ethical and legal lines. He cooperated extensively with the government at great personal and financial cost. He did so because it was the right thing to do, and because he is deeply remorseful for the pain his actions caused. His cooperation helped dismantle a harmful enterprise and contributed directly to the convictions of others more culpable.

Today, Mr. Hyer continues to support his wife ▇▇▇▇, whose health has declined dramatically in recent years. She suffers from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ that make her dependent on his daily care. He works full-time as an employment recruiter and has built a steady, legal career. His earnings go

toward her care and toward anticipated restitution payments. If incarcerated, his wife will lose her caregiver, and his ability to repay victims will be significantly diminished.

Mr. Hyer has no criminal history, has complied with pretrial conditions for over seven years, and has demonstrated a commitment to rehabilitation and contribution. His history, cooperation, and present-day responsibilities make him an exceptionally strong candidate for leniency under the factors enumerated in 18 U.S.C. § 3553(a) and U.S.S.G. § 5K1.1.

Since turning himself in to the FBI on April 6, 2018, Mr. Hyer has taken extraordinary strides to change his life in a positive way. *See* Letters of support from family, friends, and coworkers (Submitted pursuant to Gen. Order No. 15-12, U.S. Dist. Ct., D. Ariz. (2015)).

Mr. Hyer has not merely complied with court expectations, he has redefined himself through consistent, quiet acts of service, accountability, and faith. The character letters submitted on his behalf, along with more than 50 client reviews, provide a remarkable window into who he is today: a man of deep integrity, humility, and kindness, who has committed his life to helping others find stability, dignity, and hope.

His employer, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, writes: "Dan has been the most gratifying [second-chance hire] and he has worked the hardest to turn his life around… Whatever might have driven Dan to his offense is not within him anymore." ▮▮▮▮ adds, "[Dan] has helped 252[1] people find a job… His humility is the most pronounced product of his repentance. It can't be faked."

Dan's supervisor is not alone in this assessment. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, describes Dan as: "the first to arrive and the last to leave… a servant leader who listens first, defers to others, and owns his failures with humility." He writes: "Dan is one of the nicest, most gentlemanly professionals I have ever met."

Letters from family and friends describe the same qualities. His wife's lifelong friend, ▮▮▮▮▮, writes: "He is one of the kindest people I've encountered in my nearly 60 years." His

---

[1] Mr. Hyer has placed an additional 28 candidates since ▮▮▮▮▮▮ letter.

friend of over 30 years, ▬▬▬, affirms: "Daniel has shown a steadfast and resolute demeanor in moving past his previous mistakes." His father, ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ and describes his joy and purpose in helping struggling veterans, immigrants, seniors, and returning citizens find meaningful work.

His mother notes that Dan has always been spiritual, but that now his faith and service are tightly interwoven: "He tells us about the joy he has when he's able to find employment for men and women. If the client is open to hearing Christ's messages, he comforts them with scripture passages."

His close friends echo this: "Dan is the kind who has countless Bible verses memorized and does his best to live by them," writes ▬▬▬▬▬▬. She adds, "Even when going through his own difficulties, he made time to support others."  She also shares an example that captures his everyday ethics: "Dan accidentally dented the door of a car parked behind him. No one saw this, but he insisted on finding the owner inside to pay for the damage."

This theme is reflected repeatedly in the nearly 50 client reviews on Google.  Job seekers describe Dan as: "kind of the perfect combination of coach/cheerleader/therapist all rolled into one"; "the embodiment of commitment to long-term success"; "a trusted mentor and an expert in his field." One writes, "He treated me like a person, not a product." Another shared: "▬▬▬ changed my life."

Dan works with candidates facing unemployment, underemployment, reentry, disability, and language barriers.  He trains new recruiters and mentors his peers.  Despite being the firm's top performer, he consistently credits God and others for his success.  As one reviewer put it: "It's obvious that he cares deeply about the people that he helps."

All of this stands in stark contrast to the person Mr. Hyer was during the period of offense.  Those who know him best -- and those who have only recently come to know him -- agree: he is not the same man.  He has repurposed his drive, discipline, and talents into service.  He has made amends, not just through words, but through action.

As one colleague summarized it best: "Dan has the habit of consistently being a help and blessing to others." And as his mentor ▮▮▮▮▮ wrote to the Court: "Removing him from being a leader, a teacher and a mentor would be very sad. Think of all the people Dan would not be able to help if he were not here."

B. **Section 3553(a)(1) -- The Nature and Circumstances of the Offense**

Section 3553(a)(1) also directs the Court to evaluate the nature and circumstances of Mr. Hyer's offense. Mr. Hyer's conduct was not aggravated.

While Mr. Hyer pleaded guilty to one count of conspiracy, the record, including the government's evidence, trial testimony, and the Presentence Investigation Report, makes clear that his role was limited in scope, duration, and authority. The offense itself involved serious and far-reaching misconduct, and Mr. Hyer accepts full responsibility for his participation. Section 3553(a)(1), however, directs the Court to consider not only the nature of the offense but also the nature of this defendant's specific involvement.

Mr. Hyer had no ownership interest in Backpage, no policy-making authority, and no financial incentive beyond his modest salary. He did not participate in executive strategy sessions and had no access to offshore accounts, crypto wallets, or the site's technical infrastructure. Mr. Hyer was originally hired by Carl Ferrer in 1998 to sell classified print ads for the Dallas Observer and remained a Dallas Observer employee until 2012. At Scott Spear's direction, he began assisting with Backpage marketing in 2006, with gradually increasing responsibilities in a narrow functional area: sales aggregation.

Mr. Hyer did not supervise moderators, direct ad content or policy, or coordinate with the legal or development teams. His responsibilities were confined to marketing operations under the direction of Ferrer, who in turn reported to Spear. Ferrer, who became the nominal owner of Backpage in 2015, exercised operational control over the company, negotiated the TER partnerships, and implemented the "Dallas Plan." He had authority to shut down Backpage globally, direct crypto and domain asset transfers, and manage the company's high-level vendor

and financial relationships. Mr. Hyer had none of that power. His role was limited to marketing executing marketing directives, not strategic planning.

Importantly, Andrew Padilla[2], who held similar managerial authority over a different department, was acquitted at trial. Mr. Hyer, like Padilla, was a department-level employee, not an architect of Backpage's enterprise.

Viewed through this lens, a sentence that fails to distinguish Mr. Hyer's limited role from that of the principals' would contravene § 3553(a)'s command to tailor punishment to individual responsibility. Mr. Hyer did not structure transactions, direct moderation, mislead regulators, or launder money. He cooperated extensively, met with the government approximately 53 times (many of those meetings lasting several days and required travel to Arizona) over seven years, and provided critical testimony and that supported the successful prosecution of more culpable parties. In sum, the individualized factors outlined in § 3553(a)(1) support the recommended non-custodial sentence.

C. **Section 3553(a)(2) --**

Section 3553(a)(2) directs the Court to evaluate a sentence sufficient to "(A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." As the Supreme Court in *Kimbrough* made plain, the Court should fashion "a sentence sufficient, but not greater than necessary" to meet these goals. 552 U.S. 85, 101. A fair consideration of those factors tilts in favor of a sentence below the Guidelines range.

Mr. Hyer respectfully submits that the recommended non-custodial sentence is sufficient, but not greater than necessary, to meet each of these goals. While the offense was unquestionably serious -- and more serious than Mr. Hyer appreciated at the time -- his conduct must be evaluated

---

[2] Notably, Padilla -- along with Ferrer, Lacey, Larkin, and McDougal -- were subpoenaed to testify before Congress, while Mr. Hyer was not.

considering the totality of his post-offense behavior, his limited role in the enterprise, and the significant collateral consequences he has already endured. A Google search of Mr. Hyer's name plus Backpage returns multiple headlines and coverage that will forever mark him as a convicted felon. This public and permanent reputational harm serves as a powerful deterrent and, in effect, a lifelong sanction that diminishes his ability to pursue legitimate business ventures, earn a stable income, or hold positions of trust. This enduring stigma alone advances the goals of punishment and specific deterrence under § 3553(a)(2)(A)-(C).

Mr. Hyer has been fully compliant with pretrial supervision for more than seven years. He has no prior criminal history. His life is now centered around faith, accountability, and helping others, as documented extensively in letters from employers, clients, friends, and family. He presents no threat of future criminality, and no further incarceration is necessary to protect the public.

The high-profile nature of this case, Mr. Hyer's public guilty plea, and the lasting visibility of his conviction provide sufficient general deterrence. Incarceration is not the only tool to communicate that a crime is serious. The chilling effect of his felony conviction, alongside his demonstrated remorse and full cooperation with the government, sends a strong message that unlawful conduct, even within a corporate hierarchy, carries lasting consequences.

Three Ninth Circuit cases underscore the Court's discretion to impose individualized, non-custodial sentences where justified by the facts. In *United States v. Whitehead,* 532 F.3d 991 (9th Cir. 2008), the defendant was convicted by jury of trafficking $1 million in counterfeit DirecTV access cards. The court-imposed probation with 1,000 hours of community service, a $50,000 restitution order, and five years of supervised release, despite a guideline range of 41-51 months. The Ninth Circuit affirmed the downward variance. In *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008), where the defendant stole and sold nearly $645,000 in inventory, the Court imposed one day in custody and twelve months in community confinement. In *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009), a child pornography possession case with a guideline range of 41-51 months, the court imposed five years of probation based on the defendant's individual background

and low risk of re-offense. All three sentences were affirmed.

Like the defendants in *Whitehead*, *Ruff*, and *Autery*, Mr. Hyer's conduct, while unlawful, was not violent and was undertaken at the direction of others. He has no history of defiance, obstruction, or recidivism. His role was limited to marketing; under the supervision of executives he had worked with for decades. He has spent the last seven years rebuilding his life, caring for his medically fragile wife, mentoring coworkers, and helping hundreds of jobseekers re-enter the workforce. He is, by every account, a transformed man whose involvement in this conspiracy was an aberration, not the definition, of his life.

Accordingly, Mr. Hyer respectfully submits that the recommended sentence fully satisfies the aims of § 3553(a)(2). It is proportionate, protective, deterrent, and rehabilitative, yet no greater than necessary.

### D. Sections 3553(a)(3), 3553(a)(4), and 3553(a)(5).

Sections 3553(a)(3) through (a)(5) direct the Court to assess the kinds of sentences available statutorily and pursuant to the United States Sentencing Guidelines, as well as the policy statements and amendments issued by the United States Sentencing Commission. This section gives effect to *Kimbrough*'s directive for this Court to consider the advisory Guidelines like the rest of the section 3553(a) factors.

### A. Guidelines overview.

The first task to determine the advisory guidelines range is to calculate the sentencing range for each count of conviction by applying the offense guidelines in Chapter Two (Offense Conduct), then applying applicable adjustments from Parts A, B, and C in Chapter Three. *See* U.S.S.G. § 1B1.1(a)(1)-(3) (Application Instructions).

To make the Chapter Two (Offense Conduct) assessment, the Court must first determine the defendant's relevant conduct. U.S.S.G. § 1B1.2 ("Relevant Conduct (Factors that Determine the Guideline Range)"). In sum, a defendant is responsible for his own actions, and "in a case of jointly undertaken criminal activity," he is also responsible for the actions of others that were:

(i)   within the scope of jointly taken criminal activity;

-11-

(ii)   in furtherance of that criminal activity, and

(iii)  reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(B).

Mr. Hyer respectfully contends that at least one factor in addition to his cooperation supports a downward departure from the Sentencing Guidelines. Mr. Hyer is the sole provider for ███████████████████, who has not worked for decades, counts on Mr. Hyer for all her support -- physical, emotional, and financial. Mr. Hyer thus contends a departure is warranted under U.S.S.G. § 5H1.6 (Family Ties and Responsibilities), Appl. Note 1(B) (Departures Based on Loss of Caretaking or Financial Support).

A.  Section 3553(a)(6).

Section 3553(a)(6) directs the Court to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Mr. Hyer respectfully contends that the recommended sentence thus avoids sentencing disparities within the meaning of 18 U.S.C. § 3553(a)(6).

B.  Section 3553(a)(7)

The last section 3553 factor requires the Court to consider "the need to provide restitution to any victims of the offense." In response to the Court's order (Dkt. No. 2364), Mr. Hyer jointly filed a Response Re: Joint and Several Liability for Restitution for Carl Ferrer and Dan Hyer on August 26, 2025 under seal and re-filed on the public docket on September 5, 2025.

II.  **CONCLUSION**

For the foregoing reasons, Defendant Dan Hyer requests this Court to adopt the recommendation of the U.S. Attorneys' Office and impose a sentence of probation plus a three-year term of supervised release.

DATED: August 26, 2025                MAXWELL LAW PC


                                      By:    /s/ *KC Maxwell*
                                             KC Maxwell

                                      Attorneys for Defendant DAN HYER